IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARTINIQUE WALKER,

                 Plaintiff,

v.

TOWN OF MADISON, CITY OF MONONA,
JAMES BROWN AND JACOB OSTROWSKI,

                 Defendants.

OPINION AND ORDER

20-cv-599-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Martinique Walker was attacked and injured by a police dog during an encounter with police officers in Fitchburg, Wisconsin. The officers mistakenly believed that plaintiff and her companions were involved in an earlier vehicle theft during which shots were fired. When police tried to stop the car in which plaintiff was a passenger, the car sped off, leading police on a lengthy high-speed car chase that ended with a stand-off in a cul-de-sac. Plaintiff refused to follow police instructions for several minutes, and defendant Officer James Brown ultimately ordered his canine partner to bite her.

      Plaintiff contends that Brown violated the Fourth Amendment by using excessive and unreasonable force against her. She contends that another officer on the scene, defendant Jacob Ostrowski, violated the Fourth Amendment by failing to intervene to prevent Brown from ordering his canine partner to attack. (Plaintiff included the City of Monona and Town of Madison as defendants solely on the ground that they would be responsible for indemnifying the individual officers.) Now before the court are the parties' cross-motions

1

for summary judgment. Plaintiff seeks summary judgment on her claim against Brown, and defendants seek summary judgment on all of plaintiff's claims.

After reviewing video footage of the car chase, stand-off and dog bite from several angles, I find it clear that the entire situation was extremely tense and dangerous for all involved. With the benefit of hindsight, the dog bite might have been avoided. However, defendants did not violate any clearly established law by using the canine to apprehend plaintiff under the circumstances. Accordingly, defendants are entitled to qualified immunity. Their motions for summary judgment will be granted and plaintiff's will be denied.

Turning to the undisputed facts, I note that the many of the material facts were captured on multiple chest and dash cam videos submitted by the parties. On the basis of these videos, and other evidence submitted by the parties, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

In the early morning of June 18, 2019, plaintiff Martinique Walker was at a friend's house. When she was ready to leave, she posted on Facebook that she was looking for a ride home. Ana Brindley, an acquaintance of plaintiff's, responded to plaintiff's message and came to pick up plaintiff in a red Impala four-door sedan. Plaintiff got into the front passenger seat of the Impala. A man named Martell Nicholson was in the backseat.

Around the same time, officers of the City of Monona Police Department were

responding to reports of a stolen vehicle. The incident led the Monona officers, along with police officers from nearby jurisdictions, on a lengthy high-speed car chase. Defendant James Brown, a sergeant with the Town of Madison Police Department, was dispatched to assist in the stolen vehicle incident. Brown had a canine partner named Tonto. While en route, Brown learned that four suspects were fleeing on foot, and another was driving a suspected stolen vehicle. The suspect vehicle had struck something, nearly running over police officers who were on foot. The driver had then abandoned the vehicle and fled on foot.

At one point during the chase, a police officer advised dispatchers that he had located the four suspects on foot and was attempting to apprehend them. The officer then yelled, "Shots fired!" The officer reported that one of the suspects had fired two rounds with a firearm. Officers then lost track of the suspects. Defendant Brown and his canine partner Tonto searched the area but did not find anyone. At around 2:28 a.m., defendant Jacob Ostrowski and Officer Mashak, from the Monona Police Department, were advised that a red Impala might have picked up or attempted to pick up the suspects. (The parties do not elaborate as to why officers suspected the red Impala was involved, and plaintiff does not argue that officers lacked reasonable suspicion to stop the Impala.) Ostrowski and Mashak located a red Impala and attempted to pull it over. The red Impala was the same vehicle that Ana Brindley was driving, and in which plaintiff and Martell Nicholson were passengers.

Brindley, who was intoxicated, did not comply with the stop. Instead, she sped off and led the officers on a high-speed chase throughout the Dane County area, traveling in speeds in excess of 100 miles per hour. Police officers deployed spike strips, which deflated

the vehicle's tires, but Brindley continued to drive the vehicle on its rims. At around 2:45 a.m., Brindley turned the red Impala down a dead-end road that ended in a cul-de-sac in Fitchburg. She stopped the car in a residential driveway at the end of the road. Plaintiff was terrified throughout the chase, and she did not know why police had attempted to stop the red Impala or why Brindley had refused to stop.

At least nine or ten officers from multiple jurisdictions took positions in the road surrounding the Impala, just beyond the driveway in which it had stopped. The officers drew their firearms. The vehicle's windows were dark and tinted, and the officers could not see who the occupants were, how many there were or whether they were armed. Officer Mashak shouted commands for all occupants to open their windows and place their hands outside the vehicle. Defendant Ostrowski also gave commands over a loudspeaker. The occupants did not respond.

Defendant Brown arrived on the scene with his canine, and the officers discussed how best to proceed. They radioed dispatch for a negotiator, but none was available. They considered using a bean bag projectile, a shielded team of officers to approach the vehicle, or Tonto. Officer Ostrowski announced over the loudspeaker that this was a "high-risk situation" and that all nearby residents needed to get inside their homes and find a safe location. He again commanded that the occupants put their hands outside of the windows and walk toward the officers backwards. The suspects did not comply, and remained in the vehicle from 2:46 a.m. to 2:56 a.m..

At or around 2:56 a.m., plaintiff opened the front passenger door slightly. Ostrowski

4

commanded plaintiff to open the door fully and put her hands up and on top of the front-passenger door of the vehicle. Police officers, including Brown and Ostrowski, warned plaintiff that if she did not comply with commands, she would get bitten by a dog. At 2:58 a.m., plaintiff exited the front passenger door of the Impala. Ostrowski directed Walker to put her hands up and face away from the officers. Mashak shouted to plaintiff to comply or the dog would bite her. Brown commanded plaintiff, repeatedly, to put her hands in the air, face away from the officers and walk toward the officers backwards. Brown also warned plaintiff that she needed to comply with his commands or she was going to "get bit."

Plaintiff did not follow the officers' orders. She instead threw a purse to the ground in the driveway. She pointed to the purse, and Brown warned plaintiff to "not reach for the fucking bag or you will get bit." Plaintiff put her hands in the air, slightly above her shoulder level, where she remained for several seconds. She then walked away from the Impala, past the purse, to the lawn on the side of the driveway opposite where the car was parked, and sat down, facing the officers. She was a few feet from the purse and the open passenger door. Officers asked plaintiff why she would not walk towards them and plaintiff responded that she could not walk. Officers stated, "you just walked right there!" Plaintiff responded "you guys need to come and get me."

At about the same time, Brown asked other officers about the stolen car. Another officer responded that the Impala was "not stolen," but that it had "tried to pick up the people that fled from us." Brown asked, "Okay, but they did not?" The officer responded, "Well, we don't know that. The dog indicated a pickup, and we didn't find the suspects.

5

We don't know if the suspect was in that vehicle or not." Brown stated that it seemed as if the suspects were trying to "lure" the police to the vehicle, and he stated that he was going to send his dog. Brown again commanded plaintiff to walk toward them or she was going to get bit.

The rear passenger-side door then opened, and a man exited (Martell Nicholson). Officer Ostrowski instructed Nicholson to put his hands up, face away, and walk backwards toward the officers, just as plaintiff had been instructed. Nicholson followed commands, turned away from officers and walked backwards toward the officers with his hands up. Nicholson was detained without incident.

While Nicholson was walking toward the driveway, plaintiff put her hands down in her lap, where she kept them for more than one minute. As Nicholson was being detained, Brown moved forward toward the edge of the driveway with Tonto. Plaintiff had been sitting in the lawn for approximately two minutes at this point. Brown yelled to plaintiff, "You need to come toward us or you're going to get bit!" and "Ma'am you're going to get bit, you need to comply." Plaintiff told the officers that she wanted her phone, and she gestured toward the purse in the driveway. (Defendants say that plaintiff rotated her full body toward her purse or the vehicle, but the video footage does not support this assertion. Plaintiff only gestured toward her phone.) When she gestured, Brown yelled, "I do not want my dog to—Do *not* move on that! I will send my fucking dog on you. You need to come toward us or you're going to get bit." Plaintiff then stopped gesturing toward her purse and put her hands up. She shook her head, stating "I want my phone now! I want my phone

6

now! I want my phone now! Phone now! Phone now!" Plaintiff's hands were up for approximately 5 seconds, when Brown released Tonto, yelling "stellen!" which is the Dutch command for bite. Tonto ran toward plaintiff and bit her on the inside of her upper right thigh. Plaintiff's hands were up at the time Tonto was released and bit her. The bite lasted between 10 and 14 seconds, until officers moved in to apprehend plaintiff. Plaintiff screamed in pain, cried, and then said, "Okay, okay, okay." A group of officers ran up and handcuffed plaintiff. At the same time, another group of officers ran to the red Impala and apprehended the driver, Brindley. Plaintiff was arrested and taken to the hospital. Tonto's dog bite left scars on plaintiff's leg.

OPINION

Plaintiff contends that defendant Brown used excessive force in violation of the Fourth Amendment when he ordered his canine partner to attack her. She also contends that defendant Ostrowski's failure to intervene to protect her from Brown's use of force was a violation of the Fourth Amendment. Defendants contend that their actions did not violate the Fourth Amendment and that, even if they did, they are entitled to qualified immunity.

A. Legal Standards

Plaintiff's excessive force claim originates from the Fourth Amendment's protection against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989). An officer's use of force is analyzed under an objective reasonableness standard, and "must be judged

7

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. A court examines an officer's use of force in light of the following factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Id.

Qualified immunity protects government officials from liability, even in cases with plainly bad outcomes, if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

It is particularly important that courts apply qualified immunity correctly in excessive force cases, because excessive force is an area of the law "in which the result depends very much on the facts of each case." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018). See also City of Tahlequah, Oklahoma v. Bond, —U.S.—, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted). Police officers are entitled to qualified immunity

in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue." Cibulka v. City of Madison, 992 F.3d 633, 639 (7th Cir. 2021). Thus, to overcome qualified immunity in an excessive-force case, the plaintiff must either (1) identify a closely analogous case that established a right to be free from the type of force the police officers used, or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. Id.

### B. Plaintiff's Excessive Force Claim

Before applying these standards to the facts of this case, I begin by acknowledging that plaintiff did not deserve to be bitten by a police dog. Plaintiff was not armed, was not involved in the vehicle theft, and was not responsible for Brindley's reckless high-speed flight from police. She was the victim of very unfortunate circumstances, and was understandably scared when she found herself surrounded by several officers with guns drawn and barking dogs. However, because defendants have raised the defense of qualified immunity, the court's task is not to determine whether plaintiff's injuries were deserved, regrettable or preventable. The court must instead decide whether the facts, taken in plaintiff's favor, show that defendants violated a constitutional right that was clearly established at the time of the events in question. al-Kidd, 563 U.S. at 735.

Plaintiff argues that it was clearly established law that "police cannot use significant force on a passively-noncomplying suspect." Plt.'s Br., dkt. #41, at 10, 13. Plaintiff relies

on Becker v. Elfreich, 821 F.3d 920 (2016), another case involving a canine police partner, for this proposition. However, the general principle from Becker that "officers cannot use significant force on a nonresisting or passively resisting suspect" is not sufficiently specific, by itself, to govern the outcome of this case. The Supreme Court has repeatedly warned courts "not to define clearly established law at too high a level of generality" for purposes of the qualified immunity analysis. See, e.g., Rivas-Villegas v. Cortesluna, —U.S.—, No. 20-1539, 2021 WL 4822662, at *2 (U.S. Oct. 18, 2021); White v. Pauly, 137 S. Ct. 548, 552 (2017); al-Kidd, 563 U.S. at 742. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198, 125 (2004) (per curiam) (internal quotation marks omitted). Thus, it is not enough that a rule be suggested by existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018).

The rule that "officers cannot use significant force on a nonresisting or passively resisting suspect" does not resolve all of the questions that arise in this case, such as what qualifies as "significant force" and what it means for a suspect to be "nonresisting or passively resisting." It also does not address situations in which officers face threats from multiple suspects at the same time, or in which officers do not know whether a suspect is actually surrendering or is armed and dangerous. Thus, to determine whether Becker qualifies as clearly-established law that controls the outcome of this case, I must consider whether the factual context of the force used in Becker is sufficiently similar to the factual

10

context of this case.

In Becker, police officers went to Becker's mother's home to execute an arrest warrant, based on Becker's having threatened to kill someone with a knife three weeks earlier. Id. at 923. From the front porch, Becker's mother "called upstairs to her son that the police were there to arrest him." Id. The parties disputed whether the defendant officer gave warnings before releasing his canine partner into the home. According to Becker, "within two minutes of his mother's announcement, he began descending the stairs," from his upstairs bedroom, "with his hands on top of his head so officers knew he was surrendering." Id. at 924. As Becker was descending, the officer released his canine, which reached Becker as he was three steps from the bottom of the stairs. The dog bit Becker's ankle, and Becker shouted, still with his hands up, "Call the dog off. I'm coming towards you." Id. The officer reached Becker and the dog, but did not command the dog to release Becker. Instead, the officer "grabbed Becker . . . and yanked him down the last few steps onto the floor, where he landed hard on his chest and head." Id. According to Becker, the dog continued to bite him for several minutes "while violently shaking his head." Id. The officer ordered the dog to release Becker only after Becker was handcuffed. Becker had to undergo surgery and stay in the hospital for two or three days to recover, and he suffered severe permanent muscle and nerve damage as a result of the incident. Id. at 925.

The facts of Becker are clearly distinguishable from the present case. Becker's alleged crime, threatening someone with a knife, had occurred several weeks earlier and there was no reason to suspect that Becker was armed or in a position to attack police at the time of

11

the arrest. Id. at 927. In contrast, defendant Brown ordered his canine to bite plaintiff during a lengthy and ongoing police encounter, involving allegations of vehicle theft, two high-speed vehicle chases, shots fired by suspects, officers being nearly ran over, and a 15-minute standoff in a residential neighborhood. Brown did not know whether plaintiff or any of the other passengers of the red Impala were armed or dangerous, but he was reasonably concerned for officer and public safety in light of the circumstances. Because of the heavily-tinted windows, Brown could not see into the Impala, and he feared that the individuals in the car were planning an ambush. The situation was far more tense, uncertain and dangerous than the situation in Becker.

Also, Becker involved a single suspect, who had announced that he was complying with officer commands and walked toward the officer with his hands on his head. Nonetheless, and without warning, the officer permitted his canine partner to bite the suspect for several minutes, causing permanent damage, and did not command the dog to release Becker until after he was handcuffed. In contrast, defendants in this case faced an unknown number of individuals posing unknown threats, and a plaintiff who refused to comply with officer commands that she turn around and walk toward them with her hands up. In contrast to the officer in Becker, multiple officers warned plaintiff repeatedly that if she did not comply, a dog would bite her. Plaintiff continued to refuse, instead telling officers that they would have to come and get her. When Brown finally ordered his canine partner to apprehend plaintiff, the dog bite lasted a few seconds, and plaintiff did not suffer an injury close to the type of serious injuries that Becker incurred.

Thus, like the instant case, the <u>Becker</u> case involved an officer commanding a canine partner to bite a suspect, but the similarities between the two cases end there. <u>Becker</u> does not "squarely govern[] the specific facts at issue." <u>Cibulka</u>, 992 F.3d at 639. Every reasonable officer familiar with <u>Becker</u> would not have known that commanding a canine to apprehend plaintiff in the particular circumstances that defendants in this case faced was a Fourth Amendment violation. <u>Mullenix v. Luna</u>, 577 U.S. 7, 11 (2015) ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'") (citation omitted). Besides <u>Becker</u>, plaintiff identifies no other clearly established, existing precedent that would have placed defendants on notice that their actions violated plaintiff's constitutional rights.

In this instance, defendants faced a situation that was dangerous, tense, uncertain and rapidly evolving—precisely the context in which the Supreme Court has counseled courts to make allowances for on-the-scene decisions about the amount of force that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]" <u>Graham</u>, 490 U.S. at 396–97. Thus, although the outcome of this incident was unfortunate, not every officer would have know that defendants' conduct under the circumstances was, beyond question, a violation of the Fourth Amendment. Thus, defendants are entitled to qualified immunity, and plaintiff's claims must be dismissed.

## ORDER

IT IS ORDERED that:

1. Plaintiff Martinique Walker's motion for summary judgment, dkt. #40, is DENIED.

2. The motions for summary judgment filed by defendants City of Monona and Jacob Ostrowski, dkt. #34, and defendants James Brown and the Town of Madison, dkt. #23, are GRANTED.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 9th day of November, 2021.

                                                           BY THE COURT:

                                                           /s/
                                                           _____
                                                           BARBARA B. CRABB
                                                           District Judge